AMERICAN LAUNDRY MACHINERY MFG. CO. v. TROY LAUNDRY
MACHINERY CO., Limited.

(Circuit Court, N. D. New York. July 21, 1909.)

No. 7,193.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—CLOTHES-DRIER.
  The Barnes patent, No. 684,776, for a clothes-drier, consisting of a
  drying room through which the clothes are moved on a conveyer, was not
  anticipated, and is for a new combination of old elements, which by a
  new mode of operation produces an improved result and discloses patenta-
  ble invention. Also, *held* infringed.
  [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—CLOTHES-DRIER.
  The Hagen & Cooper patent, No. 735,366, for improvements in clothes-
  driers of the endless conveyer type, the improvements being in the con-
  veyer, was not anticipated, and discloses invention. Also, *held* infringed.
  [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit to restrain alleged infringement of United States
letters patents for "clothes-drier" and "improvements in drier," re-
spectively, and for an accounting.

See, also, 171 Fed. 870.

Church & Rich (Frederick F. Church, of counsel), for complain-
ant.

E. B. Stocking, for defendant.

RAY, District Judge. Prior to the taking of the proofs herein, this
suit was before me on motion for a preliminary injunction and fully
and ably argued by the same counsel who presented it on the final
hearing. This court then gave to the claims and prior art full and
careful attention and wrote an opinion on denying the motion, which
is found in 161 Fed. 556, and I need not repeat what was there said,
as the proofs at final hearing are largely a reproduction of the evi-
dence contained in the affidavits used on the motion. This court then
intimated that the question of patentable invention, in view of the prior
art, depended largely, if not wholly, on the question of whether the
new combination or arrangement of old elements shows a new mode
of operation with a new or an improved result.

Speaking in a general way, and not taking note of minor changes
in form of construction, which it is conceded do not amount to patent-
able invention, the claims in issue, 1 to 6 inclusive, of the Barnes patent
in suit, No. 684,776, dated October 22, 1901, for "clothes-drier," is
a combination of old elements to form a drying room. Each and
every element of these claims is found in the prior art. Drying rooms,
heating coils on the side or sides of such rooms, conveyers traversing
such rooms, absence of heating coils from the central portion of the
room, and air circulating devices, such as a fan, driving the air down-
ward, are found in the prior art or in analogous arts. This the proofs
demonstrate beyond all question. However, we do not find in the
prior art or in analogous arts the elements of the claims in suit ar-
ranged or located in the same way with respect to each other as in

the patent in suit. In the prior art we do not find the same perfect, speedy, and uniform result that is produced by the combination in question. The result sought is the speedy, and thorough, and even drying of collars and cuffs, or other clothing or clothes without soiling or scorching. Laundrying and the drying of articles of clothing, either completed or in process of manufacture, by artificial means—that is, not in the open air, or by simply suspending same in the air in a room—is an important art, and with the growth of our great cities and large towns is becoming more and more so. The Pilgrim Fathers at Plymouth in 1620 had no use for such a structure. The housewife on the farm in Dakota has no use for them; but in great cities and populous centers the drying rooms are a necessity. Economy of space, cleanliness, capacity for drying a large number of articles evenly and uniformly in the drying room without entering it to suspend and remove the articles, and speed in drying, are all important. Others had occupied the field; but there was room for improvement in speed, uniformity of drying, cleanliness, and moving the articles into, through, and out of the room itself.

It is well-known that wet articles may be dried in cold dry air, and in hot or warm air, not loaded with moisture. Drying will take place with little circulation; but for speed and effectiveness circulation is necessary. The air loaded with moisture absorbed from the wet articles must escape from the drying room, and fresh air must be admitted, heated, and circulated. It is important that the general tendency of the main current of air be downward, and not from side to side or upward; that the air, hot, and that partially cooled, shall be thoroughly mixed when the drying articles are suspended; and that the temperature throughout the room be substantially the same. It is also important that all the articles to be dried be subjected to the same heat in the same order from the time of entering the room to the time of emerging therefrom. These conditions Barnes sought to satisfy, and, in my judgment, he made a substantial advance in the art. He has located his heaters on the sides of the room, his fan in the center overhead so constructed as to drive the air downward, except on the very sides of the room above the heaters, and he has not interfered with the downward current by placing heaters on the floor. The carrier so traverses the room that all the garments, collars, and cuffs, are exposed, substantially, to the same heat by direct radiation and the same heat and current after passing the heaters.

There is an abundance of evidence that this drying room is superior to any that preceded it. This is emphasized by the fact that the defendant has copied this arrangement and structure in all its parts. On the final hearing the defendant's counsel conceded this, stating that there were some differences, but none of sufficient moment to dwell upon. This is evidence of an improved result, viz., the better, speedier, more uniform drying of the articles. By the new arrangement of the different elements of the combination and added elements, we get a different mode of operation of the heated and circulated air upon the drying articles. The fan is in the upper part of the room, and it was there before. Heaters are on the sides of the room, and there were heaters on the sides of such rooms before; but, as

a whole; there is a different arrangement. In the prior art articles were dried, but not as speedily and uniformly as in this room. The air was heated, but not wholly at the same point or points. The air was circulated and commingled, "stirred up" by a fan, but not in the same way it is done by this Barnes.machine. I think that patentable invention is disclosed. This is not a case of the transposition of elements from one sphere of action to another sphere of action. It is the taking of elements of this art, or elements of this and an analogous art, and forming a new combination so as to produce a new or different mode of action of the air upon the articles to be dried, and so produce a better, an improved result. I think this constitutes invention. It required much study and thought, and the combination when finally made was a happy one and beneficial in its results.

Barnes desired to apply heated air in a room to wet articles so as to dry them speedily and uniformly; that is, in a particular way. He desired to avoid their flapping against each other, to prevent their falling from their supports and becoming soiled, to prevent overheating and burning or scorching. By a new arrangement of old elements or devices and added devices, he has accomplished what he undertook. His device has largely superseded others used for the same purpose, and the defendant company has appropriated it. It is, of course, true that to constitute anticipation it is not necessary that we find the exact combination claimed in any one prior patent. Here we do not find the exact combination claimed by Barnes in any one prior patent or publication. We do not find all the elements of Barnes' combination in any one prior patent or publication. Hence we have a new combination. Elements are added, and by adding them we get a new mode of operation; that is, a new mode of applying the heated air to the wet or moist clothing and an improved result. Barnes did more than a mechanic skilled in the art was capable of doing. He was dealing with heated air and applying it to damp or wet articles to be dried. It was easy enough to construct a room, a fan, a carrier, a coil of pipes, or radiators heated with steam or hot water. It was easy to place these in the room and carry the articles in and about the room and out again; but it was not easy or simple to so arrange these elements as to give equal application of the heated air in succession to all the articles. Others had tried and failed, or were only partially successful. Barnes did what had not been done before. He accomplished more perfectly what had been accomplished before, viz., he dried speedily, uniformly, thoroughly, and without soiling or scorching a large number of articles in a moderate sized room all at the same time, and he did this much better than it had been done by the prior devices and more speedily and with less damage.

### Hagen & Cooper Patent.

This patent, dated August 4, 1903, No. 735,366, to Arthur T. Hagen and Daniel M. Cooper, assignors to the A. T. Hagen Company, has 13 claims; the sixth, seventh, and tenth, being in issue here. These read as follows:

"6. The combination with a track, a conveyer traveling thereon having a plurality of carrying devices, a driving mechanism, and controlling devices for

the driving mechanism, of stop devices adjustable on the conveyer for co-operating with the controlling devices to arrest the movement of the conveyer when desired.

"7. The combination with a traveling conveyer having a plurality of carriers thereon, strippers for the carriers, and means for operating the strippers, of a driving mechanism for the conveyer, means for controlling the latter and adjustable stops on the carriers adapted to co-operate with the controlling means. * * *

"10. The combination with the track, the conveyer, and supports on the latter operating on the track and a plurality of carriers on the conveyer, of driving devices for the conveyer, stationary means for controlling said driving devices, and means adjustable on the carriers engaging said means for controlling the driving devices by the movement of the conveyer on the track."

## In the specifications it is stated:

"Our present invention has for its object to provide a drier of the endless-conveyer type particularly adapted for carrying small articles to be dried—such as articles of wearing apparel, collars, cuffs, etc.—into and through the drying room or apartment, the air in which is heated by steam or otherwise, and automatically removing the articles from the conveying mechanism, preferably on the outside of the chamber or room; and the invention relates particularly to mechanism for conveying the articles and removing them from the conveyer, and, further, in the provisions made for arresting the operation of the conveyer when desired. * * * In using the apparatus the conveyer is driven continuously in the direction of the arrow shown in Fig. 1; the driving mechanism controlled by the controlling-lever, 16, being in the position shown in Fig. 2. The articles to be dried, such as collars or cuffs, are hung upon the pins, 23, of the carriers at some convenient point outside of the chamber, and they are then carried by the conveyer into the drying-chamber through the aperture, 50, and back and forth therein any desired number of times, and finally pass out of the aperture, 50, to the exterior. As the carriers, 22, pass beneath the projection or arm, 27, the upper ends, 26, of the strippers will be engaged thereby, and the strippers tilted to the position shown in dotted lines in Fig. 3, stripping the articles from the supporting-pins, 23, and allowing them to drop into a suitable receptacle placed beneath. When it is desired to arrest the operation of the conveyer—as, for instance, when one carrier has made a complete circuit of the drying chamber—the pin, 30, is inserted in the recess in the carrier which is to be arrested, and when this pin engages the arm, 20, of the lever, 16, the latter will be tilted and, drawing upon the flexible connection, 14, will operate the movable clutch-section and disconnect the driving mechanism. By providing means whereby the driving mechanism can be disconnected from the conveyer when any of the supports reach a predetermined position, the operators applying the articles may cause the stoppage of the mechanism as often as desired during its passage through the drying-chamber in order to permit the separate lots of articles to be deposited in different receptacles arranged beneath the stripper-operating cam; a change of receptacles being effected during the stoppage of the conveyer. We find in practice that, by arranging a separate positively-actuated stripper upon each of the supports attached to the conveyer, each stripper moving in close proximity to the supporting-pins, 23, the articles will be positively removed and cannot become fastened to the pins by the drying starch."

The utility of this combination in a drying room or chamber is easily understood. As the conveyer moves, the attendant attaches a row of collars, then a row of cuffs, or the goods of A. and then those of B. and then those of C. ·When dried and ready to be removed from the carrier by the stripping process, it is desirable that collars shall not be mixed with cuffs, or that the goods of A. shall not be commingled with those of B., and so on. If, now, when the collars are stripped off into a receptacle, the movement of the conveyer can be stopped until that receptacle is removed and another substituted to

receive the cuffs, or when the goods of A. are stripped off into its receptacle the movement is arrested until a new receptacle can be substituted to receive those of B., and so on, there is a great saving of time and labor in sorting, etc.

In the combination of claim 6, we have: (1) The track; (2) a conveyer traveling thereon, and having a plurality of carrying devices; (3) a driving mechanism; (4) controlling devices for the driving mechanism; and (5) stop devices, adjustable on the conveyer for coöperating with the controlling devices to arrest the movement of the conveyer when desired.

Claim 7 adds "strippers for the carriers" and "means for operating the strippers."

Claim 10 has: (1) The track; (2) the conveyer and supports thereon operating on the track; (3) a plurality of carriers on the conveyer; (4) driving devices for the conveyer; (5) stationary means for controlling the driving devices; and (6) means adjustable on the carriers, engaging such stationary means for controlling the driving devices by the movement of the conveyer on the track.

These elements act together and produce a result or results. As a general proposition, we have an endless chain mounted on a series of sprocket wheels and guideways. This is driven by a shaft which is geared with two of the sprocket wheels. To stop the movement of the conveyer temporarily, there is a driving shaft connected with the shaft by a clutch mechanism having two members (11 and 12), one of which is splined to the driving shaft, and the other to the sprocket shaft, and is so adapted as to be moved into and out of engagement with the fixed member of the clutch. The movements of one member into and out of engagement with the other are controlled by a lever connected with a handle, whereby the clutch members are engaged, and the lever is also connected with a cord or chain by which the members are disengaged. The disengagement is automatic, and the conveyer can be stopped at any predetermined point. This is done by means of pins or projections which are attached to the chain or to the hangers on which the articles to be dried are supported. The lever has an arm, which projects downwardly, which is held in the path of the projections on the conveyer by a weight thereto attached. This is capable of being moved by a projection or pin on the traveling chain to lift the weight, operate the lever, throw out the clutch and so arrest the conveyer. The goods, collars, cuffs, or other articles are suspended on the conveyer by hangers or carriers, which are provided with pins extending parallel with the conveyer. A stripping device is also mounted on each carrier. This embodies a pivoted plate having perforated ends, and the plate encircles the pins; also, an upwardly extending arm which is so arranged as to be engaged by a stationary cam or projection to tilt the stripper pivoted stripper plate, and so remove the dried articles from the pins when in the desired position outside the dryroom.

I do not find this in the prior art, or in analogous arts. Described in a general way, the operator stands outside the dryroom and attaches the articles to be dried to the carriers on the conveyer by pushing the

pins through the buttonholes. When all the collars are attached, or all the goods of A. are attached, the operator inserts the pin, 30, into a socket on the carrier, which is a part of the stripper of that carrier. The goods are then carried into and through the dryroom and dried. As they pass out, the end of the stripper engages the cam before mentioned, and the dried goods are disengaged and fall into a receptacle provided for the purpose. It is this pin, 30, that engages the end of the lever, 20, which is connected to the clutch mechanism, and the movement of the conveyer turns the lever and disengages the clutch and arrests the movement of the conveyer. This indicates that all the goods of a particular kind, as collars, or all the goods of a particular customer, as those of A., have been dried and dropped into its receptacle. The operator now changes the receptacle, removes the pin, and starts the movement of the conveyer by turning lever 20 and re-engaging the clutch. The pins may be applied to any carrier on the chain.

There is proof that this device has gone into general and extensive use, and the proof is quite conclusive that defendant has appropriated it and is using it. The real defense is that, in view of the prior art, it is not patentable. Infringement is substantially conceded if the patent, as to these claims in issue, is good.

I have examined the prior patents relied upon to show anticipation or to so limit the claims as to show want of patentable invention. Mr. Greeley, the defendant's expert, stated that the patent to Boswell, No. 118,783, contains the nearest approximation of the elements or parts recited in claims 6, 7, and 10, of the Hagen & Cooper patent in suit. He claims that it establishes anticipation, especially when considered with other prior patents. Mr. Freeman, the complainant's expert, on the other hand, fails to find therein any of the elements of the patent in suit, unless it be an endless conveyer. I am unable to agree fully with either expert. The device of the Boswell patent operates vertically, not horizontally. To the endless chain are attached, at intervals, horizontal platforms; those on one side being adapted to receive a load of material to convey it to the top of the building, or it may be at some intermediate floor. The platforms on the other side receive loads to carry them to the bottom of the shaft or the ground. As the starting, after a stop, is controlled by a man on one side, the ascending side, the one using the platforms on the other would risk his life every time he should step thereon. The traveling chain is driven by some operating power, engine or horse power, by means of a shaft. Between the driving shaft and the one connected to the sprocket wheel of the chain there is a clutch mechanism thrown into operation by a spring. To the clutch lever two sliding and pivoted bell cranks, which operate in suitable guides on the standard, are connected. One of the ends of these levers is adapted to be engaged by the ascending platforms. When the elevator is set in motion, it will ascend until one of the loaded platforms engages the bell crank, when the clutch is thrown out, and the operating mechanism held at rest until the operator kicks off the bell crank. The mechanism then starts, but is surely and inevitably stopped when the next platform reaches the bell crank. We have no stop devices adjust-

able on the conveyer, no adjustable stops on the carrier, no means adjustable on the carriers engaging means for controlling devices by the movement of the conveyer on the track.

The aim and purpose of the Hagen & Cooper patent is not to arrest the movement of the conveyer at any one point inevitably, but to permit it to travel any desired distance, and to stop at a point to be determined by the operator, and always with reference to the material carried. If the Boswell device could be adapted to a drying room and made to work in a horizontal plane, which I question, much time would be lost, as the conveyer would be stopping when no stop was desired, and much of the clothes-holding space would be useless or vacant at times, as the stops would be predetermined and only occur after a certain distance had been traveled. Hence a few articles would take up much space and in other cases there might be a stop when only part of the articles of a particular customer had been stripped. In Hagen & Cooper the starting and stopping is under the absolute control of the operator, and a given point on the conveyer may make an entire circuit of the room without any stop at all, if it is not desired to change receptacles. Applied to a drying room, the Boswell device would be far from effective. It would require much more than the skill of a mechanic to make the necessary changes, additions, and modifications to adapt the Boswell device to such a room. It has no hangers and no strippers. This Boswell patent is, at best, suggestive. It is not an anticipation.

I do not think it necessary to go into detail with the other patents. Nowhere do we find the device of the patent in suit. Nowhere, taking the prior patents altogether, do we find devices which combined by the skill of the mechanic would produce the device of the patent in suit. This being so, I am constrained to hold that the Hagen & Cooper patent is valid, not anticipated, discloses mental conception, with means for making it effective, which amounts to patentable invention. Here the patentee did what had not been done before by a combination of elements which is not found in the prior art. Its value is amply shown. Its success and desirability is not denied. Defendant uses it. Others demand it and use it. It is a time and labor saver.

It seems now a simple thing to do what the patentees did, and not all improvements constitute patentable invention. However, the state of the art and common knowledge, as they existed at the time of the alleged invention, are potent and controlling considerations. These patents are presumptively valid, and it cannot be said that they show want of patentable invention on their face. Considering the prior art and common knowledge and the patent itself, if the court has doubt, commercial success, general adoption by the trade, and by users of the patented device becomes an important, and many times a controlling, consideration, and the doubt is resolved in favor of the patent.

The defendant urges that there is no patentable co-operation between the automatic stopping mechanism and the stripping mechanism of claim 7 of this Hagen & Cooper patent. The contention is that the conveyer of this patent is in all essentials the conveyer of the Barnes patent, and also of the Norton patent (British), 1,204, and that the conveyer of the Barnes patent was provided with carriers and strippers

operated by the movement of the carrier, and that the Norton patent, 2,685, had automatic mechanism for releasing the goods on its conveyer. The defendant also contends that therefore, if there by any co-operation between the stripping and stopping mechanism of Hagen & Cooper, it is the result of selection, and not an inventive act. I do not think the result stated necessarily follows the premises. If the different mechanisms are in the prior art in the same and other combinations, or the one element is in one prior patent, and the other in another prior patent, or if there are two different mechanisms performing a certain function in the prior art, and if Hagen & Cooper have simply transferred them to their dryroom, brought them together to perform the same function, produce the same result, while acting in the same way, we have merely a selection of elements if there was more than one in the prior art. If only one, then we have merely a transfer from one dryer to another; but Hagen & Cooper have done much more. So far as mere names are concerned, they have taken elements from this or analogous arts, but they have different forms, a different combination, with a different mode of action and a new result. The defendant's counsel says in his brief:

"But it is said that stopping the conveyer and the strippers gives time in which the operator can remove one basket and replace another. The speed at which these conveyers travel gives ample time to change the basket, which would not take five seconds, while the conveyer is moving, as it travels at such a speed that collars and cuffs are delivered at intervals of ten seconds, as I have frequently timed them, so that this great advantage is so theoretical that it dwindles into insignificance when put to a practical test, and it is yet to be shown that these two devices are simultaneously used to any material respect whatever by practical laundrymen as all the articles are, in usual practice, indiscriminately put through the operations of a commercial laundry, and are identified by individual marking."

Individual marking by the owner, of course, enables the laundryman to identify the goods of A., of B., and so on; but it in no way tends to keep the goods of A. separate from those of B., unless sorting by hand is resorted to. The combination of the patent in suit does away with sorting after drying. The goods of A. are placed on the carriers and are stripped off altogether, in succession, of course, and then the conveyer stops. The receptacle is changed, and then the operator again starts the mechanism or movement of the conveyer. The quotation is rather addressed, it seems to me, to the nonutility of the complainant's device. I do not find it true that the conveyer moves so slowly that there is time to change the receptacle after the goods of A. have been stripped off before those of B. are dropped. I am convinced that, if the conveyer is left in normal movement, the strippers operating at the same time as the suspended goods are reached, and the receptacle containing the goods of A. is removed, some of those belonging to B. will be on the floor before any operator can put another receptacle in position. If this is not so, why does the defendant appropriate and use the devices of the patent in suit? Why has it copied so exactly the device of the Hagen & Cooper patent? I am always disposed to hold an alleged inventor to strict accountability, where he has no new elements in his combination, but only an alleged new arrangement, an alleged new mode of operation, and an

alleged new or improved result. It is clear to me that the patent in suit, Hagen & Cooper, is valid and infringed.

Recurring to the Barnes patent and the prior art applicable thereto, I think it well to refer more specifically to the Thompson (British) patent, No. 14,375, which invention relates to the dry-air stoves in which rubberproof garments are dried for vulcanizing and deodorizing purposes. It is designed, says the patent, "to provide mechanism for carrying the garments into, through, and out of the stove without the attendant opening or entering it." The garments are attached outside to the chain, or a band, which carries them into and through the stove and brings them out again. The stove is heated or may be heated by steam pipes and, says the patent, "the foul or vitiated air is drawn out by an air propeller or fan of any suitable construction." The chain travels continuously, and the garments enter the stove through holes or slits provided with flaps of rubber or other elastic or flexible material to close the openings after the garments have passed in or out, as the case may be, for the purpose of preventing the escape of heat.

The complete specifications state that this stove may be heated in any convenient way, preferably by steam pipes laid over the floor and extending up one or more sides of the chamber, and that the vapor arising from the garments is drawn off by a fan or air propeller of any suitable construction; fresh air being admitted through openings provided for the purpose.

It will be noted that this is merely a hot-air chamber through which the garments pass for the purpose of being vulcanized and deodorized, and that the fan is used simply to drive out the vitiated air. There is no special arrangement of elements for the purpose of securing uniformity of temperature throughout the stove or any particular current or currents of air, etc. The Barnes patent goes far beyond this in its scope and purpose. The Norton patent of October 29, 1864, No. 2,685, uses drying cylinders to commence the drying process, and, while it is a compound machine for both drying and tentering, either part may be used separately. The patentee also says that:

"In place of the preparatory drying being performed by means of the steam cylinders, the fabrics may be partially dried by being passed through a heated chamber, the fabrics passing over a series of rollers to and fro, or in a zigzag or other direction either vertically or otherwise. The chamber may be heated by coils or bends of steam pipes, arranged so that the fabrics pass between the coils or bends of pipe, or other convenient means of heating the chamber may also be resorted to. A steam blast or exhaust, or forcing fans, or blowers may be used with advantage in removing the moisture from the chamber."

It seems quite plain that Norton was striving to secure direct radiation for drying the articles of clothing, etc., and that the idea had not dawned upon him that the fan or blower, if used, could by proper arrangement be utilized to secure a proper mixture of the air, secure uniformity of temperature, aid in the drying process, and secure uniformity, speed, etc., as does Barnes. He uses his fan, if used, to drive the moisture from the room, and he arranges or locates same with no other purpose in mind. So his steam coils are arranged to secure drying by direct radiation. He again says:

"The hanks (of yarn) are dried by heat applied conveniently by coils of steam pipes, and the draught may be increased by using an exhaust or forcing fan."

While Norton has a room, a conveyer, clips to fasten the goods thereto, heating coils, and a fan if desired, he is far from the combination of the Barnes patent in suit, far from its conception, mode of operation, and result.

There will be a decree for the complainant on both patents in issue.